## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| **DEVELOPERS SURETY AND** | ) |
| **INDEMNITY COMPANY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )      **Civil Action No.:  1:16-cv-1124** |
| | ) |
| **LESTER J. BELCHER, JR.,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### PLAINTIFF DEVELOPERS SURETY AND INDEMNITY COMPANY'S
### REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Shannon J. Briglia, Esq.
Shoshana E. Rothman, Esq.
BRIGLIAMCLAUGHLIN, PLLC
1950 Old Gallows Road, Suite 750
Vienna, Virginia 22182
www.briglialaw.com
sbriglia@briglialaw.com
srothman@briglialaw.com
Telephone: (703) 506-1990
Facsimile:  (703) 506-1140
*Attorneys for Plaintiff Developers Surety
and Indemnity Company*

# TABLE OF CONTENTS

I.   SUMMARY OF THE ARGUMENT .................................................................................. 1

II.   DEVELOPERS' MOTION FOR SUMMARY JUDGMENT AGAINST THE
DEFENDANTS SHOULD BE GRANTED .................................................................................. 2

   A.   The Tolling Agreement Is Enforceable Against The Defendants ......................................... 2

   B.   Developers Settlement With The County Was Reasonable And In Good Faith ................. 4

     1.   The First Factor – Developers Acted Reasonably In Responding To The County's
Demands On Its Bonds ......................................................................................................... 5

     2.   The Second Factor – The Defendants Have Not Demanded That Developers Deny The
County's Claim .................................................................................................................... 10

     3.   The Third Factor – The Defendants Failed To Cooperate With Developers To Complete
The Outstanding Bonded Obligations .................................................................................. 11

     4.   The Fourth Factor – There Can Be No Dispute That Developers Conducted A Thorough
Investigation Of The County's Demands Against The Bonds ............................................... 13

   C.   The Defendants Fail To Raise Any Material Facts To Challenge The Reasonableness Of
Developers' Attorneys' Fees ..................................................................................................... 14

   D.   The Browns Have Not Established Any Material Facts To Dispute The Reasonableness
Of Developers' Costs To Complete The Outstanding Bonded Obligations ............................ 17

   E.   The Defendants Are Liable To Developers For The Bond Premiums ............................... 20

III.   CONCLUSION ........................................................................................................................ 20

## <u>APPENDIX OF EXHIBITS</u>

| | |
|---|---|
| **EXHIBIT VV:** | Developers' letter dated March 31, 2014 |
| **EXHIBIT WW:** | Utility Agreement |
| **EXHIBIT XX:** | Grading Permit |
| **EXHIBIT YY:** | Anne Arundel County Circuit Court Order dated April 15, 2013 |
| **EXHIBIT ZZ:** | County's Opposition to Developers' Motion for Summary Judgment in the State Court Action |
| **EXHIBIT AAA:** | Email from Defendant Belcher, Jr.'s counsel dated September 6, 2013 |
| **EXHIBIT BBB:** | Email from the Browns' counsel dated September 3, 2013 |
| **EXHIBIT CCC:** | Bond Principals' letter dated October 21, 2013 |
| **EXHIBIT DDD:** | Bond Principals' email dated October 21, 2013 |
| **EXHIBIT EEE:** | County email dated October 24, 2013 |

COMES NOW Plaintiff Developers Surety and Indemnity Company ("Developers"), by and through counsel, and pursuant to Fed.R.Civ.P. 56 and Local Rule 105, and states the following as its Reply Brief in Support of Developers' Motion for Summary Judgment filed against Defendants Lester J. Belcher, Jr., Edward A. Brown, and Margaret A. Brown ("Defendants").  In this Reply Brief, Developers collectively responds to: (1) Defendants Edward A. Brown and Margaret A. Brown's Response to Motion for Summary Judgment (Doc. No. 28) ("Browns' Opposition Brief") and (2) Defendant Lester J. Belcher, Jr.'s Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 29) ("Defendant Belcher, Jr.'s Opposition Brief").

## I.   <u>SUMMARY OF THE ARGUMENT</u>

At its core, the facts in this case are simple. In exchange for the issuance of surety bonds, the Defendants executed an Indemnity Agreement obligating them to reimburse Developers for exactly the type of losses that Developers is seeking to recover in this litigation.  There is no question that the Bond Principals defaulted on their bonded obligations at the Subdivision, subjecting Developers to a lengthy and expensive lawsuit filed by the County during which the Defendants could have stopped the bleeding at any time by curing their performance default. Despite repeated assurances over a four-year period that they would complete the outstanding bonded obligations at the Subdivision, the Defendants failed to complete the work by the required deadline, ultimately forcing Developers to terminate their right to complete the remaining outstanding bonded obligations so that Developers could ensure completion by the completion date established in the settlement with the County.

The Defendants now seek to avoid liability by raising speculation and unsubstantiated conclusions on matters immaterial to this dispute and ignoring the clear terms of the Indemnity Agreement.   Defendants actions were consistent with the Indemnity Agreement and the

authoritative law of this Court.  Having failed to present any law or credible evidence supporting their contentions, and for the reasons addressed in Developers' Motion for Summary Judgment, judgment should be entered in Developers' favor and against the Defendants.

## II.     DEVELOPERS' MOTION FOR SUMMARY JUDGMENT AGAINST THE DEFENDANTS SHOULD BE GRANTED

### A.     The Tolling Agreement Is Enforceable Against The Defendants

In their Opposition Brief, the Browns now allege for the first time that the Defendants' Tolling Agreement cannot be enforced because Developers did not return to the Defendants a signed copy of the Tolling Agreement endorsed by Developers.  This contention is belied by clear case authority which holds that the offeror of a tolling agreement need not sign the agreement for it to become effective.[1]

The facts surrounding the Defendants' endorsement of Developers' Tolling Agreement cannot be disputed.[2]  On March 31, 2014, Developers transmitted to the Defendants the Tolling Agreement, thereby extending the offer that Developers would refrain from pursuing indemnification of its losses from the Defendants until Developers made an attempt to collect its losses from the Bond Principals' bankruptcy estate.  *See* Exhibit VV hereto (Developers' letter dated March 31, 2014); *see also* Exhibit BB (Tolling Agreement).   On April 23, 2014, the Defendants accepted that offer, and tendered to Developers an endorsed copy of the Tolling

---

[1]  This is the first instance in which the Browns raise this argument, despite having been specifically asked about any affirmative defenses on limitations grounds in their depositions.  *See* Exhibit G (Mr. Brown's Dep.), 33:9-15 (attesting that he does not understand the statute of limitations and does not remember why he wrote in his Answer that he had an affirmative defense of the statute of limitations); *see also* Exhibit H (Mrs. Brown's Dep.), 13:3-19 (attesting that Mrs. Brown does not have any facts to support her affirmative defenses in her Answer to Developers' Complaint).  Unless otherwise identified, all references to lettered exhibits refer to the exhibits attached to Developers' Memorandum in Support of its Motion for Summary Judgment (Doc. 25-1).  Any new exhibits introduced in this Reply Brief continue that lettering.

[2] Although the Browns state on page 15 of their Opposition Brief that the permanent waiver of the statute of limitations included within the Indemnity Agreement cannot be enforced, Developers is not seeking a permanent waiver of the statute of limitations, but rather the enforcement of the Defendants' Tolling Agreement.

Agreement, therein agreeing that the statute of limitations as to any claims between the parties would be tolled for two years. *See* Exhibit BB (Tolling Agreement). The tolling agreement was effective upon acceptance by the Defendants. Federal law unequivocally supports enforcing tolling agreements that are not signed by the offeror. *See, e.g., Hanna v. Motiva Enterprises, LLC*, 839 F.Supp.2d 654, 669 (S.D.N.Y. 2012) (concluding that the parties entered into a binding tolling agreement even where the agreement was not signed by the plaintiff, and that such agreements do not even need to be committed to writing in order to become effective); *In re Commercial Financial Services, Inc. v. Temple*, 294 B.R. 164, 170-172 (N.D. Okla. 2003) (holding that the offeror of a tolling agreement need not return it to the defendants following the defendants' signature on the tolling agreement in order to make the tolling agreement effective).

In a substantially similar situation in *Commercial Financial Services*, the bankruptcy court in Oklahoma concluded that based on simple contract principles, a plaintiff's willingness to enter into a tolling agreement with the defendant constitutes an offer, and the legal effect of the defendant's signature and return of the tolling agreement to the plaintiff constituted the acceptance. *See id.* at 170. Any argument that the plaintiff "somehow had to communicate its 'acceptance'" by returning a copy of the tolling agreement signed by the plaintiff, was "legally incorrect," and "the fact that [the defendant] did not receive the signed copy from [the plaintiff] is irrelevant." *Id.* at 171-72. Applying these same basic contract principles here, the Tolling Agreement offered by Developers and signed and accepted by Defendants is fully enforceable, and the Defendants' efforts to avoid liability based upon the absence of Developers' signature on that Tolling Agreement must be rejected.

In terms of the dates of accrual of Developers' losses, the statement on page 2 of the Browns' Opposition Brief that accrual arose at the time of the County's declaration of default in

mid-2008 is also legally incorrect.  It is well-established that in contractual indemnification actions, this Court calculates accrual of a cause of action from "the time payment was made by the party seeking indemnification."  *Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F.Supp.2d 739, 757 (D. Md. 2001) (evaluating accrual from each payment that was made by the indemnified party under a simple indemnity contract) (emphasis added); *see also Developers Surety and Indemnity Co. v. Brantly Development Group, Inc.*, 2016 WL 5868550 (D.Md. 2016) (Exhibit TT) (holding the same).  The dates of each of Developers' payments which it seeks to recover from the Defendants is included in Developers' Memorandum in Support of its Motion for Summary Judgment and the exhibits thereto, and all of those losses are within the statute of limitations, as paused by the Tolling Agreement.  *See* Undisputed Facts, ¶ 43 and Exhibit LL (identifying the amounts and dates of payment by Developers to its completion contractor, Dirt Plus, Inc.); ¶¶ 44-45 and Exhibits U and V (identifying the amounts and dates of payment by Developers to the Guardian Group, Inc. and Boyd & Dowgiallo, P.A.); ¶ 46 and Exhibit MM (identifying the amounts and dates of when the premiums were due on Developers' Bonds); and ¶ 48 and Exhibits NN and OO (identifying the amounts and dates of payment by Developers to its attorneys).

      **B.**      <u>**Developers Settlement With The County Was Reasonable And In Good Faith**</u>

The Defendants next attempt to defeat summary judgment by suggesting that this Court overlook precedential surety law from this Court, and instead apply non-binding older decisions from Maryland state courts, including a case discussing the "bad faith" standard applied to insurance companies in insurance coverage disputes.  While Defendant Belcher, Jr.'s Opposition Brief recognizes that *Atlantic Contracting* is the proper standard in Maryland to evaluate a surety's right to indemnification following a surety's settlement with a bond obligee, and further acknowledges that *Republic Insurance* is not the correct standard, Defendant Belcher, Jr.

nevertheless urges the Court to apply the holding in *Republic Insurance*, a state court opinion which preceded the line of surety decisions by this Court, cited in Developers' Motion for Summary Judgment.[3]   *See* Defendant Belcher, Jr.'s Opposition Brief, pages 17-19 (conceding on page 19 that the bad faith discussed in *Republic Insurance* "is not the standard.").

Similarly, Defendant Belcher Jr.'s reliance upon the *Sharrow* decision, which involves a complaint brought by an attorney alleging that an insurance company tortiously interfered with his attorney-client fee agreement by directly negotiating and settling a claim with the client, is not determinative of this case, since that decision does not even remotely involve surety law.   *See generally Sharrow v. State Farm Mutual Auto. Ins. Co.*, 63 Md.App. 412 (1985).   Here, there can no dispute that Developers acted in response to the County's demands on its Bonds, and even completed the bonded obligations when the Bond Principals and Defendants failed to satisfy those obligations.   *See generally* Undisputed Facts.   Developers' actions when analyzed under the *Atlantic Contracting* factors entitle Developers to recover for its losses incurred as a result of the Bond Principal's default.

1.   <u>**The First Factor – Developers Acted Reasonably In Responding To The County's Demands On Its Bonds**</u>

The Defendants first assert that Developers actions were not reasonable as required by the first of the four *Atlantic Contracting* factors because Developers failed to properly respond to the County's failure to provide Developers' with an estimate of its costs to correct the outstanding bonded obligations at the Subdivision when the County first made a demand upon Developers' Bonds.   According to the Defendants, in the absence of an estimate of costs from the County,

---

[3] *Republic Insurance* is also factually inapposite, and its holding should be limited to the narrow situation where a surety entirely refuses to take any action to satisfy its bonded obligations.   *See Republic Insurance Co. v. Prince George's County*, 92 Md. App. 528, 532 (1992) (finding that because the surety took no action on the obligee's demand, the surety prejudiced its indemnitors).

Developers should have obtained a dismissal of the County's Complaint in the State Court Action, obtained a stay of the action, or otherwise refuse to abide by its bonded obligations. *See generally*, the Browns' Opposition Brief, page 9 and Defendant Belcher, Jr.'s Opposition Brief, page 15.[4] The Defendants cannot overcome the reasonableness of Developers' response to the County for several reasons.

First, the Defendants' theory that the County must provide, or Developers must demand, an estimate of the County's costs to correct the outstanding bonded obligations in order to trigger Developers' obligation to perform, is not evidenced anywhere in the plain language of the Bond or the Bond Principals' Public Works Agreement with the County.[5] The Public Works Agreement states that in the event of a default, the surety must (a) make an election within sixty days to either complete all work at the Subdivision, or (b) make a payment to the County:

> 6.  In the event of default in the Developer's performance under this Agreement, the County shall give the Developer's surety, if any, written notification of said default.  Within sixty days of the giving of said notice, the surety shall either:
>
> (a)  Complete the required public improvements in conformance with the original plans and specifications within a time specified by the Department of Public Works; or
>
> (b)  Pay to the County within the thirty (30) days of demand by the County, a sum established by the County to defray the cost to the County for engineering, inspection, overhead and administration as well as direct production expenses arising out of the failure of the Developer to complete said improvements as required by the Agreement and to be necessary for the County to complete said improvements.
>
> 7.  The failure of the surety to make an affirmative election within the sixty (60) day period set forth in paragraph 5 [*sic*], shall constitute an election to pay the sum contained in the demand by the County.  Failure of the surety to complete

---

[4] Curiously, had Developers taken the actions which the Defendants now suggest, Developers would fall clearly within the situation disapproved of by the Maryland state court in *Republic Insurance*.

[5] Defendant Mr. Brown even recognized in his deposition that this was not a requirement of the Public Works Agreement, when attesting that the basis for his statement that he believed that Developers, as surety, had an obligation to demand an estimate from the County was based on that the County "usually give[s] you their evaluation of what it should cost to fix it."  *See* Exhibit G (Mr. Brown's Dep.), 75:3-14; *see also* Browns' Opposition Brief, pages 12-13 (citing to the same deposition testimony).

the required improvements within the time period specified by the Department of Public Works upon election of the surety to do so, shall result in forfeiture of the full penalty of the bond or other security to the County.

Exhibit 1 to Defendants' Opposition Briefs (Public Works Agreement), paragraphs 6-7.  While the next paragraph does then address an estimate of costs by the County, that estimate is <u>only</u> to be provided to the <u>developer</u> (i.e. the Bond Principals), and not to Developers, as the surety:

> 8.  The County shall, <u>with its demand upon developer</u>, include an estimate of the costs to the County for engineering, inspection, overhead and administration as well as all direct production expenses arising out of the failure of the Developer to complete the improvements required by the terms of this Agreement and which may be necessary for the County to complete.  Any delay in the payment of the estimate by the surety shall accrue interest at the rate of eight percent (8%) per annum.

*Id.* at paragraph 8 (emphasis added).  There are simply no terms in the Public Works Agreement requiring that an estimate be provided to the surety as part of the demand upon the bond, or that the surety demand an estimate from the County to effectuate a proper demand.  The other two bonded agreements for the Subdivision – the Utility Agreement (bonded by Developers' Bond No. 585778S) and the Grading Permit (bonded by Developers' Bond No. 585776S) – do not include <u>any</u> terms requiring that upon a default of those agreements the County provide an estimate of the costs of the completion of the outstanding bonded obligations.  *See* Exhibit WW hereto (Utility Agreement); Exhibit XX hereto (Grading Permit); *see also* Exhibit C (Mr. Belcher, Jr.'s Dep.), 47:5-49:10 (conceding that there are no terms in the Bonds that required Developers to demand an estimate of the completion costs from the County).

Notwithstanding the lack of an express requirement for an estimate in the contracts or bonds, the Defendants' argument that an estimate of costs must be provided to the surety was previously raised in the State Court Action, but rejected by the Anne Arundel Circuit Court.  *See* Exhibit 5 to Defendant Belcher, Jr.'s Opposition Brief (Developers' Motion for Summary

Judgment in the State Court Action); *see also* Exhibit YY hereto (Anne Arundel County Circuit Court Order dated April 15, 2013 denying Developers' Motion for Summary Judgment in the State Court Action).[6]  Regardless, the County's March 10, 2009 Bond Default Notice to Developers did include the demand that Developers issue payment to the County for $626,000, the full amount of the penal sum of the Bonds, because "[a]t the time of the initial default notice, the dollar amount of work [to be completed on the Project] exceeded the amount of the bonds."  *See* Undisputed Facts, ¶ 20 (stating that on March 10, 2009 the County issued its Bond Default Notice demanding that Developers issue payment to the County for $626,000); *see also* Exhibit ZZ hereto (County's Opposition to Developers' Motion for Summary Judgment in the State Court Action), page 8 (responding to the contention that an estimate was not provided to the surety because the dollar amount of the work exceeded the penal sum of the Bonds).  Contrary to the Browns' statement on page 4 of their Opposition Brief, Developers certainly knew of its risk exposure at the time of the County's Bond Default Notice, and that exposure was the full penal sum of Developers' Bonds.

It also cannot be disputed that the majority of the outstanding bonded obligations at the Subdivision derived from the Utility Agreement and Grading Permit, which terms unequivocally did not require the provision of any estimate of correction costs upon a default.  *See* Exhibit Y (County's letter dated March 27, 2012 identifying that thirteen of the sixteen outstanding items to be repaired or completed fell within the scope of the Utility Agreement and Grading Permit); *see also* Exhibit Z (County's letter dated December 5, 2012 identifying that ten of the twelve outstanding items to be repaired or completed fell within the scope of the Utility Agreement and

---

[6] Despite asserting that an estimate of costs should have been provided to the surety, the Browns then contradict their argument by describing the motion for summary judgment in the State Court Action as "worthless."  *See* Browns' Opposition Brief, page 4.

Grading Permit).[7]  Simply put, there cannot be any argument that the County was required to provide, or Developers must demand, an estimate of the costs in order for the County's bond demand to trigger Developers' liability under its bonds.

Defendant Belcher, Jr. next asserts that Developers' settlement with the County cannot be found reasonable because a County inspection report dated December 5, 2012 showed that several of the outstanding bonded obligations were remediated or entirely completed.  While Defendant Belcher, Jr. does not attach a copy of that December 5, 2012 inspection report, assuming that he is referring to Developers' Exhibit Z (County's letter dated December 5, 2012), Defendant Belcher, Jr.'s statement is also incorrect.  The County's December 5, 2012 letter itself identifies several items that still needed to be completed at the Subdivision, and the several notices from the County over the following year also identified other additional items of incomplete and defective work that required correction in order for the County to release the Bonds.  *See* Exhibit Z (County's letter dated December 5, 2012); *see also* Exhibit ZZ hereto (County's Opposition to Developers' Motion for Summary Judgment in the State Court Action), page 7 (stating that as of March 28, 2013 there were defects to Storm Water Management Device Nos. 1 and 2); Developers' Undisputed Facts, ¶¶ 34-41 (identifying the outstanding bonded obligations that remained incomplete or deficient at the Subdivision after December 5, 2012).

Finally, the Defendants' assertions that Developers was unreasonable in responding to the County's Complaint because it should have moved to dismiss the State Court Action, is foreclosed by the agreed-upon terms of the Indemnity Agreement.  By executing the Indemnity Agreement, Defendants agreed that Developers had the right "in its sole and absolute discretion to determine

---

[7] The statement on page 5 of the Browns' Opposition Brief taking issue with the actions of Developers because "[t]he Plaintiff's attorney never requested that the County distinguish which items of incorrect work were attributable to which of the three bonds," is incorrect because the County specifically itemized the outstanding bonded obligations falling within each of the agreements and Bonds within these letters.

whether any claims under a Bond shall be paid, compromised, <u>defended</u>, prosecuted or appealed." *See* Exhibit A (Indemnity Agreement), paragraph 2.1 (emphasis added).  Accordingly, there can be no genuine material facts in dispute that Developers' actions when responding to the County's demand on the Bonds were reasonable and in good faith.

> ### 2.   The Second Factor – The Defendants Have Not Demanded That Developers Deny The County's Claim

Turning to the second *Atlantic Contracting* factor, Defendant Belcher, Jr. states on page 16 of his Opposition Brief that Developers should not have paid the County's claim and that Defendants "disputed the fact that the Plaintiff's [*sic*] did not dispute the [County's] claim." Defendant Belcher, Jr. does not cite any support for this assertion, which is fatal to his argument, and, moreover, Defendant Belcher, Jr.'s statement is factually incorrect because Developers never issued any payment to the County in response to the County's demand for the penal sum of the Bonds.  Defendant Belcher, Jr.'s Opposition Brief also suggests that the Defendants disagreed with Developers' decision to settle with the County, but this argument is barred by the express language of the Indemnity Agreement and ignores that Defendants were consulted with and contemporaneously agreed to the settlement.   By executing the Indemnity Agreement, the Defendants clearly provided Developers with the right, "in its sole and absolute discretion to determine whether any claims under a Bond shall be … compromised," and to "take such steps as Surety may deem necessary or proper to obtain release from liability under any Bond."  *See* Exhibit A (Indemnity Agreement) paragraphs 2.1, 6.3, and 9.3.  Defendants were advised of Developers' potential settlement with the County, the Defendants agreed with that settlement, and were even "hopeful" that the County would settle with Developers.  *See* Exhibit AAA hereto (Email from Defendant Belcher, Jr.'s counsel dated September 6, 2013 stating that Defendant Belcher, Jr. was "inclined to agree" with the settlement and also asking whether "the County has (hopefully) settled

with Developers"); *see also* Exhibit BBB hereto (Email from the Browns' counsel dated September 6, 2013 stating that the Browns were "ok" with the settlement).

Defendant Belcher, Jr.'s actions further contradict his statement that the Defendants demanded that Developers deny the County's claim, as Defendant Belcher, Jr. assured Developers that he would "do whatever is necessary to resolve the matter with Anne Arundel County," thereby implicitly accepting the County's claim. *See* Undisputed Facts, ¶ 32.[8] For these reasons, the Defendants cannot overcome that Developers has met the second of the *Atlantic Contracting* factors, establishing Developers' reasonableness and good faith in settling with the County.

### 3.   The Third Factor – The Defendants Failed To Cooperate With Developers To Complete The Outstanding Bonded Obligations

In addressing the third *Atlantic Contracting* factor, the Defendants admit that they failed to cooperate with Developers, but suggest that they should not be liable to Developers because Developers should never have permitted the Bond Principals and Defendants the opportunity to complete in the first instance upon receiving the County's initial Bond Default Notice. *See* Browns' Opposition Brief, page 4; *see also* Belcher, Jr.'s Opposition Brief, page 16. In other words, the Defendants assert that Developers should have foreclosed the Defendants from attempting to cure the default, and that simply taking over and completing or paying the County at the outset of the dispute would have been more economical. This new position, which the Defendants have introduced solely for purposes of defeating summary judgment, is based upon a distorted view of the facts supported by hindsight and is entirely contradicted by the Defendants' and Bond Principals' repeated assurances that they would complete the bonded obligations and

---

[8] Defendant Belcher, Jr.'s statement on page 12 of his Opposition Brief denying that he received several of Developers' notices is immaterial. In the Indemnity Agreement, the Defendants agreed that Developers would make "a reasonable effort" to give the Defendants and Bond Principals notice and that "[s]uch notice shall be given at the last known address to Surety for Principal." *See* Exhibit A (Indemnity Agreement), paragraph 10.

secure the release of Developers' Bonds.  *See* Undisputed Facts, ¶¶ 22-23, and 32) (identifying the Bond Principals' and Defendants repeated assurances that they would complete the outstanding bonded obligations at the Subdivision).  This is not a situation where the Defendants said that they could not (or would not) complete and Developers delayed taking over which caused the costs to escalate, rather Defendants repeatedly urged Developers to allow them to cure the default, and, in fact, completed or corrected many of the items on the County's list.[9]  Defendants should not now be permitted to use Developers' consent to the Defendants' repeated requests to complete the work to mitigate their indemnity exposure against Developers.  *See* Exhibit A (Indemnity Agreement), paragraph 6.3 (authorizing Developers to consent to the completion of the Subdivision).

The Defendants' argument here is also disingenuous, because when Developers did terminate the Defendants and Bond Principals in October 2013, the Bond Principals rejected that termination and pleaded with Developers to be allowed to continue to complete the outstanding bonded obligations.  *See* Exhibit CCC hereto (Bond Principals' letter dated October 21, 2013 stating that the Bond Principals "hereby reject your termination."); *see also* Exhibit DDD hereto (Bond Principal's email dated October 21, 2013 stating that "I have rejected [ . . . ] Developer's Surety termination.").  For these reasons, it cannot be disputed that the Defendants and Bond Principals failed to cooperate with Developers to complete the Subdivision, and that Developers' actions in settling with the County were reasonable.

---

[9] As of May 2012, the County estimated the cost to complete all of the work that Defendants and Developers ultimately completed to be at least $215,246.  *See* Exhibit 6 to Defendant Belcher, Jr.'s Opposition Brief. Defendants completed much of that work at their own cost, and Developers ultimately paid Dirt Plus $57,596 to complete the last items.  Thus, by permitting the Defendants to perform, Developers worked with Defendants to reduce the amount of the indemnity demand relating to the costs of performing the work.

4.    **The Fourth Factor – There Can Be No Dispute That Developers Conducted A Thorough Investigation Of The County's Demands Against The Bonds**

Defendant Belcher, Jr.'s Opposition Brief only poses several rhetorical questions concerning whether Developers' investigation of the County's demands was sufficiently thorough, but fails to introduce any disputed material facts.  *See* Defendant Belcher, Jr.'s Opposition Brief, page 17.  For example, Defendant Belcher, Jr. asks, "what did the Plaintiff do to investigate?" and why was it necessary to hire Guardian Group?  This tactic is insufficient to overcome summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (establishing the standard for summary judgment and stating that the non-moving party has the burden of demonstrating there are disputes of material fact); *see also Morgan v. Allianz Life Ins. Co. of North Am.*, 151 F.3d 1029, *3 (4th Cir. 1998) (noting that "a court is not obliged to deny an otherwise persuasive motion for summary judgment on the basis of a vague supposition that something might turn up at trial.").

Defendant Belcher, Jr. also incorrectly asserts that Developers has not provided any information concerning its investigation of the County's demands, yet Developers' actions in investigating those demands are described in the Undisputed Facts and the Exhibits attached to Developers' Motion for Summary Judgment.  *See* Undisputed Facts, ¶ 29 and the Exhibits cited therein (identifying the actions of Developers, the Guardian Group, and Boyd & Dowgiallo to investigate the County's demands on Developers' Bonds).[10]  Defendants could have, but chose not to, depose a representative of Guardian Group or Developers concerning the scope of the investigation.  Moreover, despite Defendant Belcher, Jr.'s protestations, there is no obligation in

---

[10] Tellingly, the Defendants did not depose Developers, the Guardian Group, Inc., or Boyd & Dowgiallo, P.A.

the Indemnity Agreement for Developers to provide the Defendants with the results of its investigation.

Defendant Belcher, Jr. then attempts to establish the existence of a material disputed fact by referencing a Boyd & Dowgiallo, P.A. estimate from June 28, 2011, which he then relies on to conclude that the costs to complete the outstanding bonded obligations were only $50,000.  *See* Defendant Belcher, Jr.'s Opposition Brief, page 17.  However, that estimate is neither material, nor determinative of the costs to complete the outstanding bonded obligations.  Rather, and as the plain language of that estimate letter states, the estimated amount is only an approximation, and limited in its scope to the remediation work for the sanitary sewer pipe at the Subdivision only, and not the other items identified by the County.  *See* Exhibit 4 to Defendant Belcher, Jr.'s Opposition Brief (June 28, 2011 estimate); *see also* Undisputed Facts, ¶¶ 16, 19, 33, 40, and Exhibits I, L, Y, Z cited therein (County correspondence identifying the outstanding bonded obligations that existed in addition to the remediation of the sanitary sewer pipe).  Therefore, the June 28, 2011 estimation is not comparable with the actual costs of completion and cannot be determinative of the thoroughness of the investigation performed by Developers.

### C.   The Defendants Fail To Raise Any Material Facts To Challenge The Reasonableness Of Developers' Attorneys' Fees

The Defendants then turn their objections to Developers' attorneys' fees, but do not even attempt to distinguish the line of cases in Developers' Motion for Summary Judgment providing for the surety's recovery of its attorneys' fees.  In fact, Defendant Belcher, Jr. ignores the *Argonaut Insurance* decision entirely, and asserts the blanket objections to Developers' attorneys' fees in the manner specifically prohibited by that case.  *See* Defendant Belcher, Jr.'s Opposition Brief, 19 (making the conclusory statement, without more, that Developers' attorneys' fees are not reasonable); *see also Argonaut Ins. Co. v. Wolverine Constr., Inc.*, 976 F.Supp.2d 646, 657 (D.Md.

2013) (explaining that "blanket objections" to attorneys' fees are insufficient to successfully challenge a surety's right to the recovery of its attorneys' fees).

The Browns' Opposition Brief, on the other hand, attempts to resist summary judgment by extracting several time entries from Developers' attorneys' fee invoices, and then posing rhetorical questions concerning that work.  *See* Browns' Opposition Brief, pages 6-9.[11]  The Browns then plead for a chance to cross-examine Developers' attorneys at trial in order to confirm their suspicions.  *See* Browns' Opposition Brief, page 5.  These attempts to overcome Developers' Motion for Summary Judgment on the grounds of mere speculation, are exactly the type of unsupported suppositions routinely rejected by federal courts when deciding summary judgment. *See, e.g., Wilson v. Clancy*, 747 F.Supp. 1154, 1158 (D.Md. 1990) (stating that a party cannot withstand summary judgment by arguing that although he gathered no evidence in discovery, his luck may improve at trial); *Morgan*, 151 F.3d at *3 (explaining that a court need not deny an otherwise persuasive motion for summary judgment on the basis of "a vague supposition that something might turn up at trial."); *Lundeen v. Cordner*, 354 F.2d 401, 408 (8th Cir. 1966) (a party opposing summary judgment cannot force a trial merely in order to cross-examine an affiant); *Schneider v. McKesson & Robbins, Inc.,* 254 F.2d 827, 831 (2d Cir. 1958) (noting that had the appellants utilized discovery, they might have obtained information tending to verify their suspicions, but a party is not entitled to a denial of a motion for summary judgment on the basis of a hope that some evidence might develop at trial).

---

[11] The Browns also state on page 2 of their Opposition Brief that Developers' attorneys' fees are "not in keeping with the applicable standard for representation of a Surety," but do not provide any support for that statement, nor are the Browns themselves attorneys who could attest to the applicable standard for representing a surety.  *See* Exhibit G (Mr. Brown's Dep.), 25:16-26:17 (attesting that he is not an attorney and that he has not retained any expert to testify to the reasonableness of Developers' attorneys' fees); *see also* Exhibit H (Mrs. Brown's Dep.), 15:3-10 (attesting to the same).

The Browns also plead to be given the chance to cross-examine Developers' attorneys at trial, but such attempts to obtain testimony from a party's attorney are improper, and only permitted in the rarest of circumstances, which do not occur here.  *See, e.g., Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1330 (8th Cir. 1986) ("The harassing practice of deposing opposing counsel (unless that counsel's testimony is crucial and unique) appears to be an adversary trial tactic that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process."); *see also Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 263 F.R.D. 1, 8 (D.D.C. 2009) (stating that "[w]hen seeking to depose opposing counsel, the cards are stacked against the requesting party from the outset and they must prove the deposition's necessity.").  The Browns have not provided any evidence to demonstrate that the testimony by Developers' attorneys are necessary or unique to support such extraordinary relief.  Moreover, the testimony purportedly sought by the Browns also appears to include matters protected by the attorney-client privilege.  *See* Browns' Opposition Brief, pages 6-8 (referencing time entries reflecting communications between Developers and its attorneys).

The Browns were also specifically asked in their depositions of any specific challenges to Developers' attorneys' fee entries, and the Browns were unable to articulate any specific complaints.  *See* Exhibit G (Mr. Brown's Dep.), 25:16-26:17 (attesting that Mr. Brown has "not sat down and tried to figure it out" as to which of Developers' attorneys' fees Mr. Brown contends were not reasonable); *see also* Exhibit H (Mrs. Brown's Dep.), 13:3-7 (attesting that Mrs. Brown does not have any facts to support the denials in her Answer to Developers' Complaint).  The Browns are also incorrect in their statement on page 10 of their Opposition Brief that Developers "does not address at all why any of the fees that were spent are reasonable under the circumstances

16

because it does not describe the underlying circumstances aside from rudimentarily that there were court cases."  The facts supporting the reasonableness of Developers' fees were specifically addressed in both Developers' Fed.R.Civ.P. 26(a)(2) Disclosures and the Affidavit of Shannon J. Briglia, Esq., which were attached to Developers' Motion for Summary Judgment as Exhibits NN and OO.  The Browns did not designate any opposing expert to Developers' attorneys' fee expert.

Finally, The Browns are also factually incorrect in their statement that Developers' attorneys' fees are not reasonable because Developers' attorneys' were at the Subdivision "every day."  *See* Browns' Opposition Brief, pages 11-12.  An examination of Developers' attorneys' fee invoices (Exhibit OO) show only five instances when Developers' attorneys visited the Subdivision over the course of five years: (1) on June 27, 2011, Developers' attorney attended a meeting with the County at the Subdivision in response to the County's initial demand; (2) on July 1, 2011, Developers' attorney visited the Subdivision at the request of the County; (3) on September 23, 2011, Developers' attorney met with representatives of the Guardian Group, Inc. and Boyd & Dowgiallo, P.A. at the Subdivision; (4) on September 17, 2012, Developers' attorney met with the Guardian Group and Boyd & Dowgiallo at the Subdivision; and (5) on April 10, 2013, Developers' attorney met with the Guardian Group at the Subdivision.  *See* Exhibit OO and Exhibit 1 thereto.  Defendants' flawed factual references do not support Defendants' claim that Developers' attorneys' fees were unreasonable.

### D.   The Browns Have Not Established Any Material Facts To Dispute The Reasonableness Of Developers' Costs To Complete The Outstanding Bonded Obligations

The Browns next attempt to avoid liability for Developers' completion costs by stating that they (1) disagree with Developers' settlement with NVR, Inc. as an offset of Developers' losses, (2) they disagree with the "reasonablness [*sic*] and good faith of the billing for Dirt Plus," and (3)

that Developers "conspired" with the County to have the Bond Principals' subcontractor, State Wide, removed from the Subdivision.  *See* Browns' Opposition Brief, pages 13-14.  Once again, though, the Browns fail to provide any support for their conclusions, and ignore the plain language of the Indemnity Agreement.

First, by executing the Indemnity Agreement, the Browns agreed that Developers had the right in its sole and absolute discretion to compromise any claims, such as its claim against NVR, Inc.  *See* Exhibit A (Indemnity Agreement), paragraph 2.1.  As stated in Developers' Memorandum in Support of its Motion for Summary Judgment, Developers' claim against NVR arose from information Developers received from the Defendants and Bond Principals that NVR was responsible for at least some of the delay in responding to the outstanding bonded obligations at the Subdivision.  *See* Developers' Memorandum in Support of its Motion for Summary Judgment, page 11, note 2.  Mr. Brown recognized in his deposition though, that there was no evidence to support an action against NVR, and that the Bond Principals were really the only parties that could have pursued NVR.  *See* Exhibit G (Mr. Brown's Dep.), 53:14-54:13 and 56:6-9 (attesting that apart from photographs which Mr. Brown claimed to have provided to the County, there was no other written documentation to support his claims against NVR, and that Bond Principal Lester J. Belcher, III "was really the only one that could pursue them.").[12]

Second, the Browns' only support for their conclusion that Developers' payment to its completion contractor, Dirt Plus, Inc., was unreasonable, was Mr. Brown's deposition testimony that State Wide would have completed the outstanding bonded obligations at no cost.  Even if true, however, Developers gave the Defendants and the Bond Principals every opportunity to complete

---

[12] The County produced its files in this matter in response to a subpoena for documents from the Browns, but there were no photographs in the County's files corresponding to the photographs referenced by Mr. Brown in his testimony.

the outstanding bonded obligations over the course of four (4) years, and the Defendants, Bond Principals, and their contractor, State Wide, did not complete those obligations.  *See generally* Undisputed Facts, ¶¶ 16-41; *see also* Exhibit C (Mr. Belcher, Jr.'s Dep.), 111:14-112:22 (attesting that the sanitary sewer work was not completed by September 3, 2013); *see also* Exhibit G (Mr. Brown's Dep.), 90:1-94:15 (attesting that after having received the County's March 27, 2012 letter, Mr. Brown and Mr. Belcher, III instructed State Wide to complete the sewer line work, and that work was not completed until over a year later, and after August 16, 2013) and 137:9-11 (attesting that State Wide was not getting the job completed);[13] Exhibit Y (County's March 27, 2012 letter). The Browns then again ignore the plain language of the Indemnity Agreement wherein they authorized Developers to "take possession of the work to be performed [ . . .] and, at the expense of the Principal and Indemnitor, to complete the performance required by the Obligation or to cause the same to be completed or to consent to the completion thereof."  Exhibit A (Indemnity Agreement), paragraph 6.3.

Finally, the Browns have not identified any evidence of a "conspiracy" between the County and Developers concerning the issuance of the Stop Work Order, apart from Mr. Brown's self-serving deposition testimony.  To the contrary, the County explained its reasoning for the issuance of the Stop Work Order in several items of correspondence to the Bond Principals and Defendants. *See* Undisputed Facts, ¶ 40; *see also* Exhibit EEE hereto (County email dated October 24, 2013 identifying the legal authority for the County's issuance of the Stop Work Order to the Bond Principals). For these reasons, the Browns' challenge to the reasonableness of Developers' completion costs cannot be sustained.

---

[13] This testimony also contradicts Defendant Belcher, Jr.'s statement on page 10 of his Opposition Brief that State Wide was terminated for "not getting the job done.").

19

### E.     The Defendants Are Liable To Developers For The Bond Premiums

Although the Defendants have unequivocally acknowledged in deposition their liability to Developers for the bond premiums, Defendant Belcher, Jr. attempts to now avoid that liability by insisting that had the work been completed in 2011, Developers would not have incurred the bond premiums which it seeks to recover from the Defendants.  Developers agrees that had the work been completed by the Bond Principals or the Defendants, and Developers' Bonds released, Developers would not have incurred losses for the premiums on its Bonds.  However, there can be no dispute that the Bond Principals and Defendants did not complete the outstanding bonded obligations, rendering the renewal of the Bonds a necessity, and causing Developers to incur the cost of those premiums.  For these reasons, there can be no dispute that the Defendants are liable to Developers for the bond premiums in the amount of $28,118.00.

## III.    CONCLUSION

WHEREFORE, for the foregoing reasons, as well as those addressed in Developers' Motion for Summary Judgment, Plaintiff Developers Surety and Indemnity Company respectfully requests that this Court enter judgment in favor of Developers Surety and Indemnity Company and against Defendants Lester J. Belcher, Jr., Edward A. Brown, and Margaret A. Brown, jointly and severally, in the amount of $224,235.27 (which represents the total losses of $324,214.02, offset by $99,978.75), plus the costs of the preparation of Reply Brief in the amount of $6,642.50, plus interest at the legal rate of six percent (6%) from June 8, 2011, post-judgment interest, as well as any post-judgment collection attorneys' fees and costs that Developers Surety and Indemnity Company may expend in enforcing its judgment, and such other and further relief as this Court deems just and proper.

Dated: December 16, 2016                    Respectfully submitted,

                                            **DEVELOPERS SURETY AND INDEMNITY
                                            COMPANY**

                                            By Counsel


                                            _____/s/ Shoshana E. Rothman_____
                                            Shannon J. Briglia, Esq. (Bar No. 06718)
                                            Shoshana E. Rothman, Esq. (Bar No. 19383)
                                            BRIGLIAMCLAUGHLIN, PLLC
                                            1950 Old Gallows Road, Suite 750
                                            Vienna, Virginia 22182
                                            Telephone: (703) 506-1990
                                            Facsimile:  (703) 506-1140
                                            sbriglia@briglialaw.com
                                            srothman@briglialaw.com


## CERTIFICATE OF SERVICE

        I hereby certify that on this 16th day of December, 2016, I caused a true and correct copy

of the foregoing to be served on the following via the Court's CM/ECF system:

        Timothy F. Talbot, Esq.
        2131 Defense Highway
        Crofton, Maryland 21114
        *Attorney for Defendant Lester J. Belcher, Jr.*

        Michael P. Darrow, Esq.
        Brian D. Lyman, Esq.
        Hillman, Brown & Darrow, P.A.
        221 Duke of Gloucester Street
        Annapolis, Maryland 21401-2500
        *Attorneys for Defendants Edward A. Brown and Margaret A. Brown*


                                            _____/s/ Shoshana E. Rothman_____


21