**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DEVELOPERS SURETY AND** | * | |
| **INDEMNITY COMPANY** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-16-1124** |
| | * | |
| **LESTER J. BELCHER, JR.,** *et al*. | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

************

## MEMORANDUM OPINION

On April 15, 2016, Plaintiff Developers Surety and Indemnity Company ("Developers")
sued the Defendants Lester J. Belcher, Jr., Edward A. Brown, and Margaret A. Brown
(collectively, "the Defendants") seeking indemnification for losses, costs, and expenses incurred
by Developers in connection with surety bonds.  [ECF No. 1].  This Court has reviewed
Developers's pending Motion for Summary Judgment, and the oppositions and reply thereto.
[ECF Nos. 25, 28, 29, 30].  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2016).  For
the reasons set forth below, Developers's Motion for Summary Judgment, [ECF No. 25], will
be GRANTED.

### I.   BACKGROUND

On September 21, 2005, Developers issued several subdivision surety bonds to Lester J.
Belcher, III and Deborah A. Belcher (the "Principals") in connection with a residential
subdivision project (the "subdivision") in Anne Arundel County, Maryland (the "County").
[ECF No. 1, pp. 5-6]; *see* [ECF No. 25, Ex. F].  In order to induce Developers to issue these

bonds, the Defendants executed an indemnity agreement in the event that the Principals did not

fulfill their obligations under the subdivision agreement with the County.  [ECF No. 1, Ex. A].

Under the terms of the indemnity agreement, the Defendants agreed to, *inter alia*, be jointly and

severally liable, and to indemnify Developers:

> [F]rom and against any and all liability, loss, claims, demands, costs, damages, attorneys' fees, and expenses of whatever kind or nature, together with interest thereon at the maximum rate allowed by law, which Surety may sustain or incur by reason of or in consequence of the execution and delivery by Surety of any Bond on behalf of Principal[.]

*Id*.  Specifically, the Defendants agreed to indemnify Developers from:

> 1.2 Liability incurred or amounts paid in satisfaction or settlement of any or all claims, demands, damages, costs, losses, suits, proceedings or judgments relating to Principal's nonperformance of an Obligation or any other matter covered by a Bond.

> 1.3 Liability incurred or expenses paid in connection with claims, suits or judgments relating to an Obligation or a Bond, including, without limitation, attorneys' fees and all legal expenses, and all fees and costs for investigation, accounting, or engineering services related to the adjustment of claims and losses.

> 1.4 Liability incurred or expenses paid in procuring or attempting to procure a release of liability under or exoneration of a Bond.

> 1.5 Liability incurred or expenses paid in recovering or attempting to recover losses or expenses paid or incurred in connection with this Agreement, an Obligation or a Bond.

*Id*.  The Defendants also agreed, in connection with the exercise of any of Developers's rights

under the agreement, that:

> 2.1 Surety shall have the right in its sole and absolute discretion to determine whether any claims under a Bond shall be paid, compromised, defended, prosecuted or appealed.

> 2.2 Surety shall have the right to incur such expenses in handling a claim as it shall deem necessary, including but not limited to, expenses for investigative, accounting, engineering and legal services.
>
> ***
>
> 2.5 Surety shall have the right to reimbursement of its expenses and attorneys' fees incurred hereunder, irrespective of whether any Bond loss payment has been made by Surety. In any suit on this Agreement, Surety may recover its further expenses and reasonable attorneys' fees incurred in such suit.

*Id.* The Defendants further agreed that they would be in default of the indemnity agreement upon, in relevant part, "[a]ny default in the performance of an Obligation by Principal," or "breach of [the] agreement by Principal or Indemnitor." *Id.* Subsequent to the parties' agreement, Developers issued three subdivision surety bonds guaranteeing the completion of certain public improvement and grading work in the subdivision. [ECF No. 1, pp. 5-6]; *see* [ECF No. 25, Ex. F].

In July 2008, the County declared default on the Principals' obligations covered by the subdivision bonds. *See* [ECF No. 25, pp. 8-16]. Specifically, the County alleged that the Principals "failed to perform or complete the work authorized" under the parties' agreement. [ECF No. 25, Ex. R]. Over the next two years, Developers made several attempts to cooperate with the Defendants and the Principals to procure completion of the outstanding bonded obligations. [ECF No. 25, pp. 8-11]. Although the Defendants failed to respond to several written notices issued by Developers, the Principals assured Developers that they would "address all outstanding issues at the Subdivision." *Id.* at p. 10; [ECF No. 29, p. 5] (admitting same). However, on June 1, 2010, the County advised Developers that, although the Principals worked "for a short period of time" to remedy the outstanding obligations, all "cooperation ha[d] ceased[.]" [ECF No. 25, p. 10] (internal citations and quotation marks omitted).

Accordingly, on June 8, 2010, the County filed suit against Developers and the Principals. [ECF No. 25, p. 11] (citing [ECF No. 25, Ex. R]). On October 7, 2010, the County

advised Developers that the Principals and the Defendants had still failed to complete the outstanding bonded obligations, and the County would "move forward against Developers." *Id.* at 12 (citing [ECF No. 25, Ex. W]). On October 28, 2010, Defendant Belcher, Jr. assured Developers that he "would do whatever is necessary to resolve the matter with [the County]." *Id.* (citing [ECF No. 25, Ex. X]). However, two years later, by December 5, 2012, significant work remained at the subdivision. *Id.* at p. 13; *see* [ECF No. 25, Ex. Z]. Developers notified the Principals and the Defendants on three separate occasions that "if the remaining bonded obligations were not completed…Developers would be forced to exercise its right under the Indemnity Agreement to complete the outstanding bonded obligations at the Subdivision[.]" *Id.* at pp. 13-14. On September 6, 2013, following the Principals' continued failure to complete the outstanding bonded obligations, Developers exercised its right under the indemnity agreement to reach a settlement with the County. *Id.* at p. 14. Under the terms of the settlement, Developers agreed to complete the remaining outstanding bonded obligations at the subdivision on or before December 2, 2013. *Id.* at pp. 14-15. On October 16, 2013, Developers issued a termination notice to the Defendants and the Principals. *Id.* at p. 15. On October 21, 2013, the County issued a stop work order that barred the Principals and the Defendants from the subdivision and limited access to Developers's completion contractor. *Id.* at pp. 15-16. In late October, 2013, Developers's completion contractor finished the outstanding bonded obligations at the subdivision. *Id.* at p. 16.

Subsequently, on April 15, 2016, Developers filed suit against the Defendants seeking damages under the terms of the indemnity agreement. *Id.* at p. 2; *see* [ECF No. 1]. Specifically, Developers alleged that, "[a]s a result of the default on its bonds, Developers has incurred losses of $324,214.02 to respond to the demands on its bonds, procure the release of its bonds, and

recover its losses, for which the Defendants are jointly and severally liable to Developers." *Id.* However, Developers recovered $87,978.75 from the Principals' bankruptcy estate, and $12,000 from a settlement with NVR, Inc. ("NVR"). *Id.* at p. 18. Accordingly, the balance of Developers's losses for which it now seeks judgment totals $224,235.27. *Id.* On November 16, 2016, Developers moved for summary judgment. [ECF No. 25].

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A party seeking summary judgment bears the burden of showing that there is no evidence to support the non-moving party's case, and must only show an absence of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the non-moving party must show that there is a genuine issue for trial. *Id*.

When considering a motion for summary judgment, the court "must view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of the nonmovant." *McLean v. Ray*, 488 F. App'x 677, 682 (4th Cir. 2012) (citations and internal quotation marks omitted). The court's role is to determine whether there is a genuine issue for trial, not "to weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a

matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations marks omitted).

### III.    DISCUSSION

As an initial matter, under Maryland law, "the fundamental principles governing surety bond and indemnification relationships" are as follows:

> A surety bond is a three-party agreement between a principal obligor, an obligee, and a surety. In a performance bond context, the surety assures the obligee that if the principal fails to perform its contractual duties, the surety will discharge the duties itself, either by performing them or paying the obligee the excess costs of performance. In a payment bond, the surety guarantees the principal's duty to the obligee to pay its (the principal's) laborers, subcontractors, and suppliers.

> …The surety is primarily or jointly liable with the principal and, therefore, is immediately responsible if the principal fails to perform. Ultimate liability, however, is with the principal, not the surety. Upon default of the principal, the surety may pay the money and proceed against the principal for indemnity. The bond is the measure of the surety's obligation. In the construction industry, it is standard practice for surety companies to require contractors for whom they write bonds to execute indemnity agreements by which principals and their individual backers agree to indemnify sureties against any loss they may incur as a result of writing bonds on behalf of principals.

*Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 468 (Md. 2004) (internal citations omitted).  Thus, a principal is liable to a surety if the principal fails to indemnify the surety after the surety incurs a loss on a bond.  *Westfield Ins. Co. v. Site Maint., Inc.*, No. PWG-12-3145, 2013 WL 5964505, at *3 (D. Md. Nov. 6, 2013) (internal citations and quotation marks omitted).  If an express indemnification contract exists, the terms govern the rights and liabilities of the parties and the surety is "entitled to stand upon the letter of his contract." *See Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) (internal quotation marks omitted). An indemnification agreement "must be construed in accordance with…traditional rules of objective contract interpretation." *Atl. Contracting*, 844

A.2d at 468-69.  A broad indemnity provision will be upheld absent fraud or lack of good faith.

*See Fidelity & Deposit Co. of Md.*, 722 F.2d at 1163. However, the good faith standard requires

the surety to act in a reasonable manner in handling or paying claims. *See Atl. Contracting*, 844

A.2d at 473-74.

In this case, it is undisputed that the parties executed an express indemnification

agreement.  [ECF No. 1, Ex. A]. The indemnity agreement provisions are clear and unambiguous

and must therefore be applied in accordance with their plain meaning.  *Bell BCI Co. v. Old*

*Dominion Demolition Corp.*, 294 F. Supp. 2d 807, 812 (E.D. Va. 2003).  As noted above, the

parties' agreement requires the Defendants to indemnify Developers:

> [F]rom and against any and all liability, loss, claims, demands, costs, damages,
> attorneys' fees, and expenses of whatever kind or nature, together with interest
> thereon at the maximum rate allowed by law, which Developers may sustain or
> incur by reason of or in consequence of the execution and delivery by Developers
> of any Bond on behalf of Principal[.]

[ECF No. 1, Ex. A].  However, the Defendants contend that they are not responsible for

Developers's losses, and that summary judgment is inappropriate because there exist genuine

disputes of material fact. [ECF Nos. 28, 29].  Specifically, the Defendants argue that: (1)

Developers inappropriately relied on an unexecuted tolling agreement to support its claims; (2)

Developers failed to settle its claims with the County in a reasonable manner; (3) Developers

failed to reasonably complete its bonded obligations; and (4) Developers demands unreasonable

attorneys' fees.  *Id*.  However, the Defendants' arguments, separately addressed below, are

without merit.

### A.  Tolling Agreement

First, the Defendants suggest that there is a genuine dispute of material fact regarding the

parties' tolling agreement. [ECF No. 28, p. 1]; *see* [ECF No. 30, pp. 2-3].  Specifically, the

Defendants argue that the tolling agreement is invalid because Developers failed to sign and return a copy to the Defendants.[1]   *Id.* However, Developers contends that "[t]he tolling agreement was effective upon acceptance by the Defendants" and is therefore enforceable. [ECF No. 30, pp. 2-3].  Contrary to the Defendants' assertion, the parties' tolling agreement is valid. Accordingly, there is no genuine dispute regarding the enforceability of the tolling agreement.

Under Maryland law, "[t]he formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (citation omitted). "It is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract." *Cochran v. Norkunas*, 398 Md. 1, 919 A.2d 700, 708 (2007); *id.* at 713 (noting that there must have been "an actual meeting of the minds regarding contract formation.").   "Thus, the validity of a contract depends upon the two prerequisites of mutual assent ... namely, an offer and an acceptance." *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (internal citation omitted). However, "a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract." *Stern v. Bd. of Regents,* 380 Md. 691, 731, 846 A.2d 996 (2004) (quoting *Porter v. Gen. Boiler Casing Co.,* 284 Md. 402, 410, 396 A.2d 1090 (1979)).  Instead, "a party's conduct sufficient to manifest acceptance of the terms of a written contract will bind that party to the written contract." *Porter*, 284 Md. at 410-

---

[1] The Defendants also contend that "the tolling agreement…was unsupported by consideration and any purported acceptance of the agreement by [Developers] was not timely communicated to the Defendants." [ECF No. 28, pp. 1-2].  The Defendants' arguments fail to raise a genuine dispute of material fact.  First, the consideration for the tolling agreement was that Developers would receive more time to collect its losses from the Principals' bankruptcy estate and other sources; while the Defendants would benefit from Developers's delayed filing of any lawsuit.  Second, Developers did not need to "accept" the Defendants' acceptance of Developers's offer.  As discussed below, when the Defendants accepted Developers's offered tolling agreement, all the elements of a valid contract were present and the contract became binding on both parties.

411, 396 A.2d at 1095; *see Brutto v. Elefante & Margolies, P.C.*, 55 Pa. D. & C. 4th 556, 560 (Com. Pl. 2001), *aff'd sub nom. Brutto v. Elefante & Margolies*, 803 A.2d 787 (Pa. Super. Ct. 2002) ("Whether two parties enter into a binding contract does not depend on a document signed by both parties. Rather it depends on whether or not they have each agreed to enter into a contract, whether there has been a meeting of the minds.").  Moreover, "[w]hen parties intend for a contract to be effective upon execution, the absence of actual physical delivery will not invalidate a contract."  *Weiss v. Nw. Broad. Inc.*, 140 F. Supp. 2d 336, 344 (D. Del. 2001).

In this case, the parties executed a valid tolling agreement to pause the period of limitations.  [ECF No. 25, Ex. BB].  Although it is undisputed that the Defendants assented to the terms of the tolling agreement, the Defendants contend that Developers's failure to sign the tolling agreement renders the agreement unenforceable for lack of mutual assent. Notably, the Defendants fail to cite any language in the agreement indicating that Developers was required to sign and return the tolling agreement to the Defendants as a condition precedent to contract formation. *Cf. Brown v. Allied Home Mortg. Capital Corp.*, No. CIV. JKB-11-667, 2011 WL 3351532, at *2 (D. Md. Aug. 2, 2011) (holding that, in the absence of the required signature, there was no binding contract because "the arbitration agreement unequivocally stated that the agreement became 'effective and binding...when both parties sign it.'"). Indeed, nothing in the agreement itself states that the tolling agreement became effective only upon the signatures of both parties.

Instead, the parties both evinced an intent to be bound by the terms of the tolling agreement. *Bat Masonry Co. v. Pike-Paschen Joint Venture III*, 842 F. Supp. 174, 177 (D. Md. 1993) (noting that "a signature is not required to form a contract if there is some objective manifestation of the mutual assent of the parties to the agreement.").  It is undisputed that

Developers, as offeror, induced the Defendants to enter into the tolling agreement.[2]  [ECF No. 25, Ex. BB].  Developers drafted the agreement and presented it to the Defendants for signature. [ECF No. 30, pp. 2-3].  As a result, Developers manifested assent to the tolling agreement through its conduct.  Additionally, the Defendants, as offerees, accepted Developers's offer to enter into a tolling agreement when they signed the agreement through counsel and returned it to Developers.  *Id.*  Indeed, the Defendants do not assert, nor is there any evidence in the record to suggest, that the Defendants did not intend to pause the period of limitations at issue. Accordingly, the parties entered into a valid tolling agreement.  *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (holding that "a contract is made where the last act necessary to make the contract binding occurs.").  Therefore, the tolling agreement is enforceable.[3]

### B.  Developers's Settlement With The County

Next, the Defendants contend that summary judgment is inappropriate because Developers's settlement with the County was unreasonable.  Specifically, the Defendants argue that there are genuine issues of material fact regarding whether "Developers correctly and lawfully mitigated its damages."  [ECF No. 28, p. 2]; *see* [ECF No. 29, pp. 15-20].  Notably, the Defendants claim that Developers "failed to timely and expeditiously discover what damages the County sought to collect under the bonds or what on site work needed to be corrected and determine the cost." [ECF No. 28, p. 4].  Instead, the Defendants allege that Developers

---

[2] Although the tolling agreement states that the parties "jointly drafted" the agreement, [ECF No. 25, Ex. BB], the parties' correspondence reflects that Developers drafted the agreement and submitted it to the Defendants for signature.  [ECF No. 30, pp. 2-3]; [ECF No. 30, Ex. VV] (noting that "Developers proposes that the Indemnitors agree to the enclosed Tolling Agreement…if your clients consent to the Tolling Agreement, please have them execute the same and return to [Developers's counsel's] attention no later than Wednesday, April 23, 2014.").

[3] The Court, therefore, need not reach the Defendants' argument regarding the dates of accrual of Developers's losses.  *See* [ECF No. 29, pp. 3-4].

"wait[ed] years to request cost estimates" in order to accrue substantial fees and costs. *Id.* at 4-5. In addition, the Defendants argue that Developers failed to obtain itemized claims as required under the Public Works Agreement, and now fail to provide sufficient billing information justifying Developers's requested costs and fees. *Id.* at p. 5. In response, Developers contends that there is "no dispute that Developers acted in response to the County's demands on its Bonds, and even completed the bonded obligations when the Bond Principals and Defendants failed to satisfy those obligations." [ECF No. 30, p. 5].

As an initial matter, the parties dispute the proper legal standard regarding the reasonableness of Developers's settlement with the County. Developers argues that the parties are subject to the reasonableness standard set forth by the Maryland Court of Appeals in *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 844 A.2d 460 (2004). *Id.* at pp. 4-14. There, the court held that a surety's decision to settle a claim against a bond must be made in good faith, but construed the good faith standard to one of reasonableness rather than fraud. *Atl. Contracting & Material Co.*, 380 Md. at 309, 844 A.2d at 473-74. Defendant Belcher, Jr. contends, however, that *Republic Ins. Co. v. Prince George's Cty.*, 92 Md. App. 528, 608 A.2d 1301 (1992) controls. [ECF No. 29, pp. 17-20]. In that case, decided a decade before *Atlantic Contracting*, the Maryland Court of Special Appeals adopted a good faith standard to hold "that any act of the indemnitee that prejudices the rights of the indemnitor will release his obligation to the extent of the prejudice." *Republic Ins. Co.*, 92 Md. App. at 536-37, 608 A.2d at 1305. Contrary to Defendant Belcher, Jr.'s assertion, this Court has held that *Atlantic Contracting* applies in this context. *Travelers Cas. & Sur. Co. of Am. v. Baltimore Contractors, LLC*, No. CIV.A. WMN-08-2901, 2011 WL 1298005, at *8 (D. Md. Mar. 31, 2011) (citing *Atlantic Contracting* with support and rejecting argument that surety claims are not subject to the

reasonableness standard); *see Synergics Energy Servs., LLC v. Algonquin Power Fund (Am.), Inc.*, No. CIV.A. ELH-13-2257, 2014 WL 2812230, at *21 (D. Md. June 20, 2014).   Indeed, Defendant Belcher, Jr. concedes that *Republic* is not dispositive here.   [ECF No. 29, p. 19] (conceding that "bad faith is not the standard," but arguing that "the facts…show that the Developers did not act in good faith[.]").   Accordingly, the Court will apply the standard set forth in *Atlantic Contracting* to evaluate the reasonableness of Developers's settlement with the County.

In *Atlantic Contracting*, the factors to be considered in determining whether a surety made a reasonable, good faith settlement under the terms of a bond and an indemnity agreement are: "(1) the obligations of the surety as provided by the terms and coverage of the bond; (2) whether the principal has made more than generalized demands that the surety deny the claim; (3) the cooperation, or lack thereof, by the principal, in dealing with the surety; [and] (4) the thoroughness of the investigation performed by the surety." *Atl. Contracting*, 380 Md. at 309, 844 A.2d at 474 (internal citations omitted). The plaintiff's burden of establishing the reasonableness of the settlement is that of "satisfying the district court that it had acted in accordance with equitable indemnity principles in making the settlement and had not spent its indemnitors' money too freely." *Bruzzone Consolidation, Inc. v. M/V Blue Eagle*, 713 F. Supp. 146, 151 (D. Md. 1989), *aff'd sub nom. Bruzzone Consolidation, Inc. v. Maher Terminals, Inc.*, 900 F.2d 250 (4th Cir. 1990) (internal citations omitted).   "[I]f a surety unreasonably pays for an obligee's work that is not covered under a payment bond, then the surety should not be entitled to indemnification from the principal without further ado, under the good faith provision in the indemnity agreement." *Atl. Contracting*, 844 A.2d at 475; *see In re Kora & Williams Corp.*, No.

88-41402 PM, 2006 WL 4482004, at \*2 (Bankr. D. Md. Oct. 28, 2006), on reconsideration, No. 88-41402 PM, 2007 WL 1073994 (Bankr. D. Md. Feb. 2, 2007).

In this case, Developers's settlement was objectively reasonable and undertaken in good faith.  Turning to the first factor under *Atlantic Contracting*, Developers fulfilled its obligations under the terms and coverage of the bond. *See Atl. Contracting*, 380 Md. at 309, 844 A.2d at 474 (internal citations omitted).   Notably, the Public Works Agreement (the "PWA") between Developers and the County provided that, in the event of a default, Developers must either: (a) "[c]omplete the required public improvements in conformance with the original plans or specifications within a time specified by the Department of Public Works; or (b) "[p]ay to the County within the thirty (30) days of demand by the County, a sum established by the County to defray the cost to the County…arising out of the failure of the Developer to complete said improvements as required by the Agreement[.]"[4]   [ECF No. 28, Ex. 1].   It is undisputed that Developers elected to reach a settlement with the County regarding the Defendants' and the Principals' failure to complete the subdivision project.   However, the Defendants allege that the PWA also required Developers to seek a cost estimate from the County.   [ECF No. 28, p. 15].   Consequently, the Defendants argue that Developers's failure to secure a cost estimate from the County renders its settlement unreasonable.  *See id.*

Contrary to the Defendants' assertion, the PWA does not require Developers to secure a cost estimate.   Instead, the PWA required *the County* to provide a cost estimate to the *developer*. [ECF No. 28, Ex. 1] (noting that "[t]he County shall, with its demand upon developer, include an estimate of the costs to the County for engineering, inspection, overhead and administration as

---

[4] In addition, the PWA provided that "[t]he failure of the surety to make an affirmative election within the sixty (60) day period set forth in paragraph 5 [*sic*], shall constitute an election to pay the sum contained in the demand by the County."  [ECF No. 28, Ex. 1].

well as all direct production expenses arising out of the failure of the Developer to complete the improvements required by the terms of this Agreement[.]") (emphasis added).   Regardless, Developers diligently raised this issue in its state court proceedings with the County, and the County subsequently provided a cost estimate.   *See* [ECF No. 29, Ex. 6].   The cost estimate was ultimately unnecessary because "the dollar amount of work [to be completed on the project] exceeded the amount of the bonds."   *See* [ECF No. 30, p. 8] (internal quotation marks omitted); *see* [ECF No. 30, Ex. ZZ].[5]   Accordingly, Developers fulfilled its obligations with the County and properly elected to remit payment, rather than to complete the outstanding bonded obligations.

The second factor under *Atlantic Contracting* is "whether the principal has made more than generalized demands that the surety deny the claim."   *Atl. Contracting*, 380 Md. at 309, 844 A.2d at 474 (internal citations omitted).   Here, the Defendants assert that they have taken "the position that [the County's] claim [against Developers] should not be paid by defending the action and ha[ve] not retreated."   [ECF No. 29, p. 16]; *see generally* [ECF No. 28].   However, the Defendants have not consistently opposed Developers's settlement with the County.   To the contrary, the evidence is clear that the Defendants have at various times assented to Developers's settlement.   *See* [ECF No. 30, Ex. AAA] (noting that Defendant Belcher, Jr. was "inclined to agree" with the proposed settlement); *see* [ECF No. 30, Ex. BBB] (noting that Defendants Margaret and Edward Brown were "ok" with the settlement).   Regardless, Developers has the contractual right to reasonably settle the claim with the County notwithstanding the Defendants' objection.   Specifically, Developers has the right "in its sole and absolute discretion to determine

---

[5] Additionally, Defendant Belcher, Jr.'s argument that Developers's settlement was unreasonable because the Defendants completed all their bonded obligations is also unavailing.   *See* [ECF No. 29, p. 16].   Although Developers acknowledged the completion of some outstanding work by April 2012, the County explicitly noted that several projects at the subdivision were not completed or were defective, and that further work was necessary in order to release the bonds.   [ECF No. 25, pp. 8-16]; [ECF No. 25, Exs. Y, Z]; [ECF No. 30, Ex. ZZ].

whether any claims under a Bond shall be paid, compromised, defended, prosecuted or appealed," and to "take such steps as Developers may deem necessary or proper to obtain release from liability under any Bond." [ECF No. 1, Ex. A]. While the Defendants may have presented specific demands to Developers that it deny the County's claim, the parties' indemnity agreement vitiates the Defendants' objections.

The third factor under *Atlantic Contracting* is "the cooperation, or lack thereof, by the principal, in dealing with the surety." *Atl. Contracting*, 380 Md. at 309, 844 A.2d at 474 (internal citations omitted). Here, there is no genuine dispute of material fact that the Defendants failed to cooperate with Developers to complete the subdivision project. *See Hudson Ins. Co. v. Kumari*, No. CIV. CCB-13-1505, 2014 WL 6674575, at *8 (D. Md. Nov. 24, 2014) (noting that "[t]he most salient circumstance of this case is [the defendant's] failure to cooperate with [the plaintiffs] in evaluating [its] claims."). Notably, Developers contends that the Defendants failed to respond to several written notices demanding completion of the subdivision, failed to defend Developers in the ensuing state court action, and ultimately failed to complete the outstanding work. [ECF No. 25, pp. 8-16]. Between July, 2008, when the County issued a default bond notice to the parties, and June, 2010, when the County filed its complaint against them, Developers issued five written notices to the Defendants "requesting information relating to the County's Bond Default Notice, and advising them of their indemnity obligations." [ECF No. 25, pp. 8-10]. However, the Defendants did not respond to these notices.[6] The County also noted the Defendants' failure to cooperate during this time period. Although the County acknowledged that the Defendants and the Principals had worked with the County to remedy the subdivision

---

[6] Defendant Belcher, Jr. denies receipt of these notices. [ECF No. 29, pp. 4-5]. Defendants Edward and Margaret Brown do not admit or deny receipt of Developers's written notices. *See* [ECF No. 28].

defects "for a short period of time," it noted that, by June, 2010, "the cooperation ha[d] ceased." *Id.* at p. 10 (citing [ECF No. 25, Ex. Q]).[7]

Over the next three years, Developers provided the Defendants numerous opportunities to complete the outstanding bonded obligations. *Id.* at pp. 10-16.; *see* [ECF No. 25, Exs. Y, Z] (providing a list of the outstanding items for repair or completion under the bonds). In response, the Defendants provided assurances that they would complete the work. [ECF No. 25, p. 12] (noting that "[o]n October 28, 2010, Defendant Mr. Belcher, Jr. assured Developers that he would 'do whatever is necessary to resolve the matter with [the County]."") (citing [ECF No. 25, Ex. X]); *see* [ECF No. 29, p. 7] (conceding same). However, the Defendants ultimately failed to remedy the incomplete or deficient work in the subdivision. Regardless, the Defendants allege they made significant attempts to cooperate with Developers regarding the completion of the subdivision project throughout the period at issue.[8] [ECF No. 29, p. 5] ("Defendant and the Principals were working with the County throughout this time period[.]"); *id.* at 6 (Defendant Belcher, Jr. "advised the Developers in October 28, 2010 in a letter that he would do whatever was necessary to resolve the matter with [the County] and that the issues would be resolved."); *id.* ("the Defendants attempted to work at completing the Project."); *id.* at 7 ("Defendant assured Developers would do the work[.]"). However, the Defendants conflate their agreement to cooperate with actual cooperation. Most significantly, the Defendants concede that they did not complete their outstanding obligations as required under the terms of the PWA. *See* [ECF No. 25, Ex. G] (attesting that the outstanding bonded obligations were not completed). Instead, as

_____

[7] After the County filed suit, Developers also requested that Defendant Belcher, Jr. defend Developers pursuant to the terms of the indemnity agreement. *Id.* at p. 11 (citing [ECF No. 25, Ex. S]). Again, Defendant Belcher, Jr. did not respond to Developers's request; although he concedes he "does not know if he received [Developers's request] as he was experiencing server problems." [ECF No. 29, p. 6].

[8] Defendants Edward and Margaret Brown only summarily discuss their cooperation with Developers regarding the completion of the subdivision project. *See generally* [ECF No. 28, pp. 3-16].

the County noted following the Defendants' termination, "[t]he bottom line is that [the Defendants'] were provided with years and every opportunity to complete this project and refused and/or were unable to do so." [ECF No. 25, Ex. HH].  Accordingly, there is no genuine dispute regarding the Defendants' failure to cooperate with Developers regarding the completion of the subdivision.

Finally, the fourth factor under *Atlantic Contracting* is whether Developers conducted a thorough investigation of the County's demands pursuant to the bonded agreements.  *Atl. Contracting*, 380 Md. at 309, 844 A.2d at 474 (internal citations omitted).  Although the Defendants dispute the adequacy of Developers's investigation, Developers conducted a proper inquiry of its exposure under the subdivision bonds.  The uncontroverted evidence shows that Developers hired a third-party construction consultant, the Guardian Group, Inc., and an engineering consultant, Boyd & Dowgiallo, P.A., to investigate the County's declaration as default and to assess the status of the outstanding bonded obligations at the subdivision.  *See* [ECF No. 25, Ex. B] (affirming the solicitation of third party consultants to investigate claims initiated by the County); [ECF No. 25, Ex. U] (detailing relationship with Guardian Group, Inc.); [ECF No. 25, Ex. V] (detailing relationship with Boyd & Dowgiallo, P.A.).[9]  Developers provided the Defendants several opportunities to complete the outstanding bonded obligations, *see* [ECF No. 25, pp. 12-16]; however, the Defendants ultimately failed to make "substantial progress," *id.* at 13.  *See also* [ECF No. 25, Ex. B] (affirming that, following the Defendants' and the Principals' continued failures to complete the outstanding bonded obligations, the County advised the parties that "considerable work still remain[ed] to be repaired or completed" at the subdivision) (internal quotation marks omitted).

---

[9] In particular, this evidence directly contravenes the argument advanced by Defendants Edward and Margaret Brown that Developers failed to investigate its risk exposure regarding the outstanding bonded obligations.  *See* [ECF No. 28, p. 4].

Accordingly, Developers elected to reach a settlement with the County. *See generally id.* In support of the reasonableness of this settlement, Developers submits evidence of the cost to execute its duties as surety as well as evidence of its investigation of the County's claims. *See* [ECF Nos. 25, 30].   The Defendants contend that Developers failed to conduct a proper investigation, and therefore argue that Developers's settlement with the County was unreasonable, because "Developers had information that the job could be completed for approximately $50,000.00." [ECF No. 29, p. 18].   However, the Defendants' reliance on this estimate, taken from a June 28, 2011 report by Boyd & Dowgiallo, P.A., is misplaced.   Indeed, that estimate accounts only for an approximation of the outstanding costs Developers incurred regarding the completion of the sanitary sewer pipe at the subdivision. *See* [ECF No. 29, Ex. 4]; *see also* [ECF No. 25, Exs. I, L, Y, Z] (identifying other outstanding bonded obligations). Therefore, the Defendants may not rely on this partial estimate to argue that Developers failed to properly investigate its exposure to the County's demands or to negotiate a reasonable settlement.   Ultimately, the Defendants have not presented a genuine dispute of material fact that could permit a factfinder to determine that Developers's settlement with the County was unreasonable.

### C.  Attorneys' Fees

The Defendants next assert that summary judgment is inappropriate because a genuine dispute exists regarding the reasonableness of Developers's requested attorneys' fees and the adequacy of Developers's documentation in support of its request. [ECF No. 28, pp. 2-11]. However, Developers contends that its requested attorneys' fees, which amount to $165,310.61, are reasonable.  [ECF No. 30, pp. 14-17].

Maryland follows the common law "American Rule," which states that, generally, a prevailing party is not awarded attorneys' fees. *C-Tech Corp. v. Aversion Techs.*, No. CIV.A. DKC 11-0983, 2012 WL 3962508, at *3 (D. Md. Sept. 7, 2012).   However, Maryland law provides an exception to this rule when a contract provision explicitly provides for a fee award. *Bel Air Plaza Ltd. P'ship v. Ross Dress for Less, Inc.*, No. CV CCB-14-2533, 2016 WL 3440191, at *1 (D. Md. June 23, 2016); *see Myers v. Kayhoe*, 391 Md. 188, 207 (2006) ("Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland.").   "Indemnity agreements of this kind are interpreted generally to entitle the surety to recover fees, costs, and expenses incurred in enforcing them." *Atl. Contracting*, 380 Md. at 316-17, 844 A.2d at 478.   However, the court must also "examine the fee request for reasonableness, even in the absence of a contractual term specifying that the fees be reasonable." *Id.* (citing *Rauch v. McCall*, 134 Md. App. 624, 638, 761 A.2d 76, 84 (2000)).   "The reasonableness of attorneys' fees is generally a factual determination within the sound discretion of the trial judge." *Id.*   The court "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct (the "MRPC")] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton,* 416 Md. 325, 336-37 (2010).[10]   The burden is on the moving party to prove that its fees are reasonable by providing specific evidence detailing the "services performed, by whom they were provided, the time expended, and the hourly rates charged." *Rauch*, 134 Md. App. at

---

[10] When evaluating the amount awarded pursuant to a contract provision, the court does not conduct a traditional lodestar analysis. *Monmouth Meadows*, 416 Md. at 333-36; *see also Pennington Partners, LLC v. J-Way Leasing, LLC*, Civil No. RDB-11-0972, 2012 WL 527661, at *2 (D. Md. Feb. 17, 2012). Cases applying the traditional lodestar analysis are instructive, however, because many of the applicable factors are also found in Rule 1.5. *See Roger E. Herst Revocable Trust v. Blinds to Go (U.S.) Inc.*, No. CIV.A. ELH-10-3226, 2011 WL 6444980, at *2 n.5 (D. Md. Dec. 20, 2011).

638, 761 A.2d at 84. "Without such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence." *Id*. at 639, 761 A.2d at 85; *see Long v. Burson*, 182 Md. App. 1, 26, 957 A.2d 173, 188 (2008) ("[I]t is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges."); *see also id.* ("[A] mere compilation of hours multiplied by fixed hourly rates or bills issued to the client" is insufficient.").

Rule 1.5(a) provides a non-exclusive list of factors to be considered in determining the reasonableness of a fee, including:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

MRPC 1.5(a). These factors need not be considered separately; rather, the court need only "utilize [Rule 1.5(a)] as its guiding principle in determining reasonableness." *Monmouth Meadows Homeowners Ass'n.*, 416 Md. at 340, n.13. The "court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id*. at 337-38. Appendix B to the Local Rules provides a guideline in the form of ranges of fees based on years of experience. *See Local R., App. B: Rules and Guidelines for Determining Attorneys' Fees in Certain Cases* (D. Md. 2016). While the court is not bound by these ranges, it generally presumes a rate is reasonable if it falls within the guidelines. *See, e.g., Roger E. Herst Revocable*

*Trust v. Blinds to Go (U.S.) Inc.*, Civil No. ELH-10-3226, 2011 WL 6444980, at *5 (D. Md. Dec. 20, 2011).

In this case, Developers seeks attorneys' fees pursuant to the parties' indemnity agreement, which states, in relevant part:

> Principal and Indemnitor shall…indemnify and hold harmless Surety from and against any and all liability, loss, claims, demands, costs, damages, *attorneys' fees and expenses* of whatever kind or nature, together with interest thereon at the maximum rate allowed by law, which Surety may sustain or incur by reason of or in consequence of the execution and delivery by Surety of any Bond on behalf of Principal[.]

[ECF No. 1, Ex. A] (emphasis added).  The indemnity agreement explicitly permits Developers to recover attorneys' fees from the Defendants in the event of loss.  In fact, because the indemnity agreement mandates that the principal and indemnitor "*shall*…indemnify and hold harmless Surety from and against any and all…attorneys' fees," *id.* (emphasis added), the provision eliminates the discretion that a court typically has to deny an award of costs to a prevailing litigant.  *See C-Tech Corp.*, 2012 WL 3962508, at *8; *see id.* ("the use of 'shall' makes an award of costs to a prevailing party under the Agreement non-discretionary").  Pursuant to this agreement, Developers submitted fee records requesting $165,310.61 in attorneys' fees, plus additional attorneys' fees and expenses incurred since March 1, 2014. [ECF No. 25, Ex. OO].  To support its fee request, Developers's attorneys provide itemized time records that list the date of the work, the individual who performed the work, the time spent, and a brief description of the work done.  *Id.*  With respect to the number of hours expended, Developers submitted detailed billing records, which reflect that Developers seeks compensation for 868.2 hours of attorney time for work performed from May 2011 to present.  *Id.*; *see* [ECF No. 25, Ex. NN].  However, the Defendants contend that summary judgment is inappropriate because Developers's requested attorneys' fees are unreasonable.  Specifically, the Defendants

argue that "the fees incurred…were not needed, [and] wasteful," and that Developers's documentation "is not based on sufficient analysis or disclosures of the underlying facts." [ECF No. 28, p. 2-3]; *see* [ECF No. 29, pp. 19-20].

The Defendants fail to raise a genuine issue of material fact as to the reasonableness of the requested fees. Notably, "the Court will not review any challenged entry in the bill unless the challenging party has identified it specifically and given an adequate explanation for the basis of the challenge." *Thompson v. U.S. Dep't of Housing & Urban Dev.*, No. MJG-95-309, 2002 WL 31777631, at *10 (D. Md. Nov. 21, 2002). The Defendants contest the reasonableness of several billings contained in Developers's fee petition.[11] *See* [ECF No. 28, pp. 5-9]. As an initial matter, the Defendants mischaracterize several of Developers's attorneys' billing entries. For example, the Defendants challenge the 4.2 hours Developers's attorneys billed "to prepare a list of doucments [*sic*] and interrogatories[.]" *Id.* at 7. However, Developers's fee records demonstrate that Developers's attorneys "[d]raft[ed] requests for production of documents to County," "draft[ed] [the] first set of interrogatories to County," and "review[ed] [the] second set of interrogatories from County." *Id.* In addition, the Defendants challenge the "4 hours of

---

[11] In addition, the Defendants challenge the adequacy of Developers's documentation regarding several billing entries. For example, regarding the 2.6 hours Developers's attorneys billed to "[r]eview and analyze all pleadings and case documents," the Defendants note that Developers failed to specify "[w]hat pleadings and documents [Developers's counsel] analyzed." *Id.* at p. 6. In addition, regarding the 1.3 hours billed to revise Developers's answer, the Defendants note that Developers failed to specify "[w]hat changes [Developers's counsel] made[.]" *Id.* at 7. Moreover, regarding the 1.8 hours billed to "[r]esearch Maryland rules and coordinate service of third-party complaint," the Defendants note Developers failed to specify what research Developers's attorneys performed. *Id.* at p. 8. However, the Defendants demand information that is simply not required in a fee petition. Loc. R. 109.2 (requiring a "detailed description of the work performed broken down by hours or fractions thereof expended on each task [and] the attorney's customary fee for such like work[.]"); *see Bel Air Plaza Ltd. P'ship v. Ross Dress for Less, Inc.*, No. CV CCB-14-2533, 2016 WL 3440191, at *2 (D. Md. June 23, 2016) (noting that "the level of detail in [plaintiff's] fee spreadsheet satisfies Local Rule 109.2, particularly considering all entries are dated and grouped by phase of litigation (including, where relevant, which motion or pleading corresponds to each entry), thereby providing additional context for evaluating reasonableness."). Indeed, the Defendants fail to show that additional information is necessary to determine the reasonableness of Developers's requested fees, or that its absence prohibits meaningful review. *See* [ECF No. 28, p. 2] (stating that Developers's attorneys' "work is insufficiently described…to allow anyone to evaluate the work that was allegedly performed or the time reasonably required to perform such tasks.").

attorney time" Developers's attorneys billed to review the parties' pleadings and case documents. *Id.* at 6. However, Developers's fee records show that Developers's attorneys "[r]eview[ed] and analyze[d] all pleadings and case documents," "[m][et] with Mr. Saba regarding [the] factual background" of the County's complaint, and "prepare[d] [a] strategy for opposing complaint and potential dismissal of claims against bonds." *Id.*

As to the length of time billed, the Defendants contest the 18 minutes Developers's attorneys billed to prepare a strategy regarding a scheduling order extension, *id.* at 7, the 2.4 hours billed to draft Developers's Answer, *id.* at 6, the 1.3 hours billed to revise Developers's Answer, *id.* at 6-7, the 9.2 hours billed to prepare Developers's Third-Party Complaint, *id.* at 7, and the 10.3 hours billed to prepare Developers's Motion for Leave from Automatic Stay, *id.* at 8. *See id.* at 5-9. Contrary to the Defendants' assertion, those hours are reasonable given the nature of the work performed. *See, e.g., Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 513 (D. Md. 2005) (awarding ten hours of attorneys' fees for drafting and revising dispositive motion); *Chu v. Great N. Ins. Co.*, No. 10-CV-1422-RWT, 2014 WL 3810590, at *3 (D. Md. July 31, 2014) (same); *Bel Air Plaza Ltd. P'ship v. Ross Dress for Less, Inc.*, No. CV CCB-14-2533, 2016 WL 3440191, at *4 (D. Md. June 23, 2016) (awarding attorneys' fees for strategy preparation and noting that "[b]illing for a few hours of strategic discussions between the two primary attorneys on a case is reasonable[.]"); *Spell v. McDaniel*, 616 F. Supp. 1069, 1098 (E.D.N.C. 1985), aff'd in part, vacated in part, remanded in part on other grounds by *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) (upholding award of attorneys' fees for background research). The Defendants fail to provide any evidence to support their claim that this work should have been reasonably completed in less time.

The Defendants also argue that the number of attorneys and paralegals assigned to the case was unreasonable.   [ECF No. 28, pp. 5-9].   However, a careful review of Developers's billing records does not support the Defendants' position that this case was overstaffed and that Developers has claimed as reimbursable an unreasonable number of hours.   Indeed, in the course of five years, from May 2011 through June 2016, five lawyers and one paralegal handled four lawsuits related to the Principals' default on the subdivision bonds.  [ECF No. 25, Ex. OO].   In addition, Developers's counsel attests the hours expended by her firm and the costs incurred by Developers were reasonable.  [ECF No. 25, Ex. NN].   Moreover, Developers's counsel's staff billing rates were all within the Federal guidelines regarding hourly rates.[12]  [ECF No. 25, Ex. OO].   Considering the length and complexity of the case, it was not improper for multiple attorneys to expend significant hours working on the case.   Accordingly, Developers's requested attorneys' fees are reasonable, and do not provide a basis for denying summary judgment.

### D. Reasonableness of Developers's Costs to Complete the Outstanding Bonded Obligations

Finally, the Defendants contend that summary judgment is inappropriate because there is a genuine dispute as to the reasonableness of Developers's costs to complete the remaining bonded obligations.   Specifically, the Defendants contend that Developers's settlement with NVR, and Developers's "billing for Dirt Plus, Inc." ("Dirt Plus"), were unreasonable.[13]   [ECF

---

[12] Appendix B of the Local Rules for the District of Maryland provides "Rules and Guidelines for Determining Attorneys' Fees in Certain Cases." These rules apply when the prevailing party is entitled by contract to reasonable attorneys' fees based on a computation of hours and rates and not a fixed percentage or other formula. To guide the Court in awarding fees, the Rules provide a range of reasonable rates for legal service based upon experience and qualifications. D. Md. R. Appx. B § 3. Under these guidelines, Developers's attorneys' requested hourly rates were reasonable.

[13] The Defendants also contend that Developers "conspired" with the County to have the Principals' subcontractor, Statewide, removed from the subdivision in order to accrue additional costs. [ECF No. 28, pp. 13-14]. However, the Defendants fail to support this claim with any evidence apart from Defendant Edward Brown's deposition testimony. *See* [ECF No. 25, Ex. G].  In addition, both the County and Developers have demonstrated a reasonable

No. 28, pp. 13-14]. Developers contends, however, that the Defendants "fail to provide any support for their conclusions," and argue that both its settlement with NVR, and its payments to Dirt Plus, were reasonable.  [ECF No. 30, p. 18].

As noted above, the factors to be considered in determining whether a surety made a reasonable, good faith settlement are: "(1) the obligations of the surety as provided by the terms and coverage of the bond; (2) whether the principal has made more than generalized demands that the surety deny the claim; (3) the cooperation, or lack thereof, by the principal, in dealing with the surety; [and] (4) the thoroughness of the investigation performed by the surety." *Atl. Contracting*, 380 Md. at 309, 844 A.2d at 474 (internal citations omitted).  In this case, NVR was the home builder responsible for the construction of the residences at the subdivision.  [ECF No. 25, Ex. B]; [ECF No. 25, Ex. T] (noting that NVR entered into a contract "to purchase up to twelve fully improved single family building lots [at the subdivision] upon which it would construct homes.").   Following disputes between the parties regarding the correction of incomplete or deficient work in the subdivision, Developers sued NVR in state court, alleging that NVR was partially responsible for the failure to complete the subdivision's bonded obligations.  *Id.*   However, Developers attests that "after proceeding through discovery in the State Court Action, Developers was unable to obtain sufficient evidence that [NVR] was the cause of at least some of the outstanding bonded obligations at the Subdivision[.]"  [ECF No. 25, Ex. B].  As a result, Developers dismissed NVR from the state court complaint in exchange for a settlement payment of $12,000.  *Id.*   The Defendants now dispute the reasonableness of this settlement.

---

basis for their respective decisions to issue a Stop Work Order, *see* [ECF No. 25, Ex. GG], and to contract Dirt Plus to complete the outstanding bonded obligations, *see* [ECF No. 25, pp. 8-16]; *see also* [ECF No. 30, pp. 18-19].

Contrary to the Defendants' assertion, Developers's settlement with NVR was reasonable. As noted above, the Indemnity Agreement unambiguously provided Developers "the right in its sole and absolute discretion to determine whether any claims under a Bond shall be paid, compromised, defended, prosecuted or appealed." [ECF No. 1, Ex. A]. As a result, Developers was permitted to settle its claim against NVR in its discretion. In addition, the Defendants fail to make more than a generalized objection to the settlement. *See* [ECF No. 25, Ex. G] (noting Mr. Brown's opinion that Developers did not "pursue[] the [NVR] things properly."). Indeed, to support their assertion, the Defendants merely allege that they "would have never settled for $12,000…[b]ecause [NVR] cost a lot more than that in our time and all." [ECF No. 28, p. 13] (citing [ECF No. 25, Ex. G]; *see* [ECF No. 25, Ex. G] (noting Mr. Brown's opinion that "Developers pursued the [NVR] [claim] properly, and that was one of the big disputes because that cost a lot of money and wasted a lot of time[.]"). The Defendants do not provide any other testimony or evidence to suggest that Developers's settlement was unreasonable. Moreover, Developers provided adequate information regarding the basis for its settlement with NVR. Notably, Developers sued NVR on the basis of information gleaned from the Defendants and the Principals. *See* [ECF No. 25, Ex. B] (noting that, "[u]pon information which Developers received from the Bond Principals and the Defendants, [NVR] was responsible for at least some of the outstanding bonded obligations at the Subdivision.").[14] However, Developers determined – and the Defendants conceded – that there was no evidence to support an action against NVR. *Id.*; *see* [ECF No. 25, Ex. G] (noting that Defendant Brown

---

[14] Developers does not detail the information that led it to initiate the state court action against NVR. However, a review of Developers's Third-Party Complaint against NVR, [ECF No. 25, Ex. T], reflects that Developers raised claims regarding NVR's alleged breach of contract and negligence regarding its failure to complete the bonded obligations. In particular, Developers alleged that, "NVR uncovered an underground spring and thereafter negligently failed to contain or properly control the spring, resulting in damage to or impairment of the improvements installed by QKD and/or the Belchers." [ECF No. 25, Ex. T].

conceded he had no written documentation "to show that [NVR] caused any problems on the site[.]"). Therefore, considering Developers's evidence supporting the reasonableness of its settlement, and the Defendants' conclusory assertion to the contrary, there is no genuine dispute of material fact that Developers's settlement with NVR was unreasonable.

The Defendants have also not shown a genuine issue of material fact that Developers's payments to Dirt Plus were unreasonable. Specifically, the Defendants dispute "the reasonablness [*sic*] and good faith of the billing for Dirt Plus[.]" [ECF No. 28, pp. 13]. Following disagreement among the parties regarding incomplete or deficient work at the subdivision, Developers contracted Dirt Plus to complete "all remaining outstanding bonded obligations." [ECF No. 25, Ex. B]. Accordingly, the County advised that Dirt Plus "was to be the only entity that should be completing the outstanding bonded obligations at the Subdivision." *Id.* (citing ECF No. 25, Ex. GG). In October, 2013, Dirt Plus completed the outstanding bonded obligations at the subdivision. *Id.* Developers paid $57,596.00 to Dirt Plus for its work. *Id.*; *see also* [ECF No. 25, Ex. LL] (Developers's Dirt Plus billing invoice). The Defendants claim that this payment was unreasonable, again relying on Defendant Brown's conclusory deposition testimony. Specifically, Mr. Brown testified that Developers's payment was unreasonable because Statewide would have completed the outstanding bonded obligations at no cost. [ECF No. 25, Ex. G]; *see* [ECF No. 28, p. 13] (noting Mr. Brown's testimony that, "hardly any of [the cost] was reasonable because [the Defendants] had [Statewide] ready to do this work for nothing."); *see* [ECF No. 29, p. 7] ("[Developers] paid more to Dirt Plus for paving and completing punch out work in 2013 than it would have cost to have all the remaining work done in 2011"). However, as noted above, Developers maintained complete discretion to "take possession of the work to be performed…and, at the expense of the  Principal and Indemnitor, to

Case 1:16-cv-01124-SAG   Document 31   Filed 03/07/17   Page 28 of 28


complete the performance required by the Obligation or to cause the same to be completed or to consent to the completion thereof[.]"  [ECF No. 1, Ex. A].

The record is clear that Developers provided the Defendants, the Principals, and Statewide several opportunities over the course of four years to complete the subdivision's outstanding work. [ECF No. 25, pp. 8-16].  Following the Principals' and the Defendants' failure to complete the subdivision project, the County issued a Stop Work Order, and Developers contracted Dirt Plus to complete the subdivision.  Additionally, in further support of its reasonableness, Developers hired a third-party consultant to evaluate Dirt Plus's costs to complete the remaining work at the subdivision. [ECF No. 25, Ex. B] (affirming that "Guardian Group, Inc. also oversaw the completion of the outstanding bonded obligations by Developers['s] completion contractor, [Dirt Plus].").  Based on this record, about which no genuine issue of material fact has been raised, Developers's decision to enlist Dirt Plus to complete the outstanding bonded obligations was reasonable.  Accordingly, summary judgment is appropriate.

## IV.    CONCLUSION

For the reasons discussed above, Developers's Motion for Summary Judgment, [ECF No. 25], is GRANTED.  A separate order follows.


Dated:  March 7, 2017                                        _____/s/_____

                                                            Stephanie A. Gallagher
                                                            United States Magistrate Judge